**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TERRY WHITE,

                Plaintiff,                      CASE NO.  07-CV-10962

-vs-                                  PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

KENNETH PELLAND, et al.,

                Defendants.
_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is a December 14, 2007 Motion for Summary Judgment filed by

Defendants Detective Kenneth Pelland and Chief of Grosse Ile Police William Barron

(collectively "Defendants"). Plaintiff Terry White ("Plaintiff") filed a Response on January 7,

2008. The Court held a motion hearing on April 2, 2008.[1] Having considered the entire record,

and for the reasons that follow, the Court GRANTS IN PART and DENIES IN PART

Defendants' motion.

### I.      BACKGROUND

The case arises from Plaintiff's allegations that Defendants conducted illegal searches

and entries of his residence, falsely arrested, then maliciously prosecuted him in connection with

a truancy investigation.

At the time of the incidents in question, Plaintiff was a resident of the City of Grosse Ile

---

[1]      Officers Daniel McLaughlin and Douglas Carmack were dismissed without prejudice on November 14, 2007. At the motion hearing, Plaintiff's counsel indicated that he had no objection to dismissing these two defendants with prejudice.

in Wayne County, Michigan. (Compl. ¶ 1). Pelland, McLaughlin, and Carmack were employed as police officers for the Grosse Ile Police Department; Barron was the Chief of Police. (Compl. ¶¶ 2-5).

On November 9, 2004, Plaintiff's twelve-year-old son, Jonathan White, wrote a note containing physical threats to fellow students and staff at Grosse Ile Middle School. (Def. Br. Ex. A, 11/18/04 Letter). Two fellow students obtained the note, and turned it over to a school custodian. (*Id.*).

Assistant Principal Jack Haywood called Plaintiff around 11:00 a.m. to come to the school. (Def. Br. Ex. B, White Dep. 27). Plaintiff and Jonathan met with various school officials for about 30 to 45 minutes, and at the conclusion of the meeting, Jonathan was sent home with Plaintiff. (*Id.* at 29).

Barron instructed Pelland, a school liaison officer, to investigate the incident further. (Def. Br. Ex. C, 11/9/04 Police Report). Pelland arrived at the school and interviewed the staff about the incident. (*Id.*). Assistant Principal Haywood examined the contents of Jonathan's locker and turned over to Pelland further drawings and notes. (*Id.*). Pelland then contacted the Wayne County Prosecutor's Office for further instruction. (*Id.*).

That night, Pelland and Officer Porcarelli came to Plaintiff's house to speak with Jonathan. (*Id*; White Dep. 25). Plaintiff testified that he allowed the officers to interview Jonathan for about 15 or 20 minutes before ending it because "[i]t was very obvious that Detective Pelland was asking very leading questions with an intent to manufacture." (White Dep. 30). Pelland noted the following about the interview with Jonathan:

> Mr. White answered the door and allowed officers into his home. Mr. White indicated that he did not believe this was a police matter and that it should be addressed through

the school district. Mr. White further indicated that he is a former police officer and is currently an attorney, and that the letter did not specifically threaten anybody.

. . .

John and writer were seated in the living room and discussed the matter in length. During the entire conversation, Mr. White stood to the side or behind writer with his hands crossed, staring at John. Mr. White left the room one time to get a glass of water for himself.

Mr. White began to answer for John on at least three separate occasions and had to be asked to allow John to answer on his own each time. On one occasion, Mr. White directed John to go to his room so that he (Mr. White) could give an explanation regarding his divorce – a point when John was trying to explain his feelings when he was interrupted.

When asked a question, John would always look to his father before responding. Mr. White would attempt to interpret an answer before John could finish his remarks. It was apparent to officers that Mr. White was attempting to control John's answers and that he (John) was intimated by his father. John appeared so nervous that he was struggling to keep his mouth wet. When writer asked John if he wanted a drink of water, Mr. White seemed upset and directed John to the kitchen for a drink.

Writer attempted to develop a rapport with John, talking about video games, fishing and the internet. John was asked about the letter and why it was written. He stated that lately he has been very angry for a variety of reasons.

. . . .

When talking about his mother, John often used words such as "manipulate" and "false allegations" to describe her conduct. That was odd because of John's age (12) and it seemed as if he (John) had been told what to say.

. . . .

When asked about this reference to being killed by an (sic) "S.W.A.T. guy," [Jonathan] was reluctant to answer. Writer began to ask him about hurting himself, to which John stated that he had those thoughts several years ago. John had his head down at this point and his eyes began to tear. Writer asked if he needed a tissue, which prompted him to look at Mr. White and nervously say "my nose isn't running." It appeared as if John was afraid to talk about his feelings with his father present. Mr. White directed John to his bedroom.

(11/9/04 Police Report).

In his report, Pelland also noted that he attended the school meeting, examined the threatening note, and interviewed the witnesses. (*Id*.). Pelland then contacted Wayne County Assistant Prosecuting Attorney ("APA") Bob Heimbuch and advised him of the complaint. (*Id*.).

3

Heimbuch indicated that the situation was "serious and needed to be investigated further." (*Id*.). Pelland also notified Kathy Fleming-Clark of the Wayne County Juvenile Detention Facility about possible arrangements if an arrest was to be made. (*Id*.).

On November 10, 2004, Pelland attended a staff meeting at Grosse Ile Middle School, and informed the staff of the situation and security precautions. (*Id*.).

After holding formal hearings on November 29 and 30, 2004, Superintendent Peter J. Dion suspended Jonathan from Grosse Ile Middle School for a period of no less than 180 days. (Def. Br. Ex. A, 12/2/04 Letter). The following requirements were established for Jonathan's return: (1) a petition of reinstatement initiated after 150 days of suspension; (2) individual therapeutic treatment during the suspension with monitoring from the school; and (3) an extensive psychiatric evaluation by a board-appointed psychiatrist. Upon the request for reinstatement, a board-appointed committee would assemble to review compliance with the conditions for reinstatement. (*Id*.).

On December 15, 2004, Dion sent a letter to Plaintiff indicating that: (1) Grosse Ile Schools would grant Plaintiff's request that his son have an expedited special education; (2) the request to reinstate Plaintiff had been denied; and (3) Grosse Ile Schools would provide continuing education for Jonathan at Downriver Middle School. (Def. Br. Ex. A, 12/15/04 Letter).

Plaintiff testified that it was important to him that any school that Jonathan attended would have programs for emotionally-impaired students. (White Dep. 17-18). Plaintiff stated that the principal of Downriver Middle School indicated that it did not have a faculty member certified to teach emotionally impaired students. (*Id*.). Plaintiff further believed that if he put

Jonathan at Downriver, he would waive a portion of his current appeal before Grosse Ile Schools. (*Id*. at 19). Plaintiff stated that in either late November or early December, he contacted two additional schools: Summit Academy and Mt. Carmel. (*Id*. at 33). According to Plaintiff, Summit would not take Jonathan because of the incident at Grosse Ile Middle School, and Mt. Carmel would not allow Jonathan to enroll in advanced math classes. (*Id*. at 34-35). Plaintiff admitted that between November 2004 and June 2005, he did not submit a request that Jonathan's school transcripts by sent to any potential school. (*Id*. at 35-36).

Plaintiff stated that as of November 9, 2004, he decided to home school Jonathan. (*Id*. at 39). During the pendency of Plaintiff's appeals of the school board decision – from the date of his suspension until some point after December 2, 2004 – Haywood continued to provide Jonathan with his regular school assignments, which he completed at an outside clinic and mailed back to the school. (*Id*. at 39-40).

When Grosse Ile Middle School stopped sending homework assignments, Plaintiff testified that he began a home schooling program for Jonathan. (*Id*. at 42). Plaintiff's purported efforts included looking up the Michigan home schooling statute and designing a curriculum consisting of math, chemistry, anatomy, physiology, and social studies. (*Id*. at 42-43). Plaintiff stated that he obtained a series of "study guides" in various subjects for Jonathan. (*Id*. at 74-75).

On January 26, 2005, Pelland met with Kathryn Dombrowski, Jonathan's mother, at the Grosse Ile Police Department. (Def. Ex. A). Dombrowski "expressed a concern that her son ha[d] not been attending school since November 9, 2004." (*Id*.). She also told Pelland that she was prohibited from contacting Jonathan's school district. (Pelland Dep. 27).

On February 18, 2005, Pelland filed a complaint for truancy in the Family Division of the Wayne County Circuit Court. (Def. Ex. A, Complaint). Pelland listed himself as the complaining witness. (*Id*.). He indicated that the basis of his complaint was the facts that: (1) Jonathan had not enrolled in Downriver Middle School; (2) Jonathan's mother indicated that he had not enrolled in any school; (3) and that no other school had requested Jonathan's transcripts from Grosse Ile Middle School; and (4) Haywood had been to Plaintiff's residence twice and found Jonathan home alone during normal school hours. (*Id*.). Pelland testified at his deposition that he consciously made the decision not to speak with Plaintiff before filing the warrant request because he believed that Plaintiff would not have given him any information to support the investigation. (Pelland Dep. 48-49).

On March 15, 2005, a misdemeanor complaint was issued by the 33rd District Court against Plaintiff on a truancy charge. (Def. Br. Ex. F, Misdemeanor Complaint).

In response to the reception of the warrant, Plaintiff contacted the Michigan State Board of Education to find out whether he had missed any requirements that may have motivated the warrant. (White Dep. 48). Wanda Bazzett, Home School/Nonpublic School Liasion for the Michigan Department of Education, noted that Plaintiff had contacted her to inquire whether Michigan had a registration requirement for home schooling. (Pl. Br. Ex. 4, Bazzett Notes).

On March 18, 2005, Plaintiff received a "come in" letter from Pelland, advising him of the misdemeanor warrant. (Pelland Dep. 52-53). Plaintiff called Pelland to find out who the complainant and the arraigning judge were. (White Dep. 57). Plaintiff told Pelland to get his "rear end over to court." (*Id*.). Plaintiff voluntarily appeared at his scheduled arraignment in 33rd District Court before Judge Edward J. Nykiel. Plaintiff proceeded at the arraignment in *pro per*.

Pelland was in attendance. Plaintiff entered a "not guilty" plea, and Pelland recommended a personal bond and that Plaintiff report to the Grosse Ile Police Department for booking. (Def. Br. Ex. G, 3/18/05 Arraignment Tr. 6). Plaintiff explained to the court that he was pursuing administrative appeals from Jonathan's school suspension, but did not mention anything about home schooling. (*Id*. at 7). Judge Nykiel set a personal bond of $500.00 and ordered Plaintiff not to leave the state without permission from the Court. (*Id*.). The court asked Pelland why he insisted on booking Plaintiff, since the truancy charge was not a 93-day misdemeanor. (*Id*. at 8). Pelland explained that it was department policy to book all arrested suspects. (*Id*.).

After the arraignment, Plaintiff went over to the Grosse Ile Police Department for booking. (White Dep. 58).

On April 5, 2005, Judge Nykiel held a pretrial conference, at which Plaintiff and APA Rebecca A. Camargo appeared. (Def. Br. Ex. H, 4/5/05 Pretrial Tr.). Plaintiff had filed a motion to dismiss a few days prior to the scheduled hearing. Prior to the start of the hearing, Plaintiff was offered a "plea under advisement" deal, which he rejected. (White Dep. 60-61).

Judge Nykiel adjourned the pretrial conference until April 26, 2005, at 2:00 p.m. – at which time he indicated he would consider the motion to dismiss. (Pretrial Tr. 6-7). Plaintiff then informed the court that he was homeschooling Jonathan. (*Id.* at 10). APA Camargo produced a subpoena for Plaintiff, and the following exchange occurred on the record:

> Ms. Camargo: Your Honor, I have one more – excuse me – one more thing to address. The People are asking that – we have a subpoena for John – Jonathan White for the motion hearing, but we would also ask that he produce all school books and education materials used for homeschooling. I do have a subpoena to give to Mr. White today –
> Defendant: How do you want 'em?
> Ms. Camargo: -- to subpoena Mr. White to produce the child, as well as the school books and education materials.

| | |
|---|---|
| Defendant: | How do you want 'em? |
| Ms. Camargo: | Pardon me? |
| Defendant: | He's – he's got books that he's working out of. I mean – |
| Ms. Camargo: | I want anything that has to do with his homeschooling. I want that in court. |
| Defendant: | I'll – I'll produ – do you want copies – |
| Ms. Camargo: | I want the physical books, and his notebooks and his pens (sic) and papers. |
| Defendant: | No problem. |
| Ms. Camargo: | Thank you. |
| The Court: | At the hearing. |
| Ms. Camargo: | At the hearing. |
| Defendant: | At the hearing; okay. |

(*Id*. at 15-16).

During the April 5 hearing, Camargo instructed Pelland to go Plaintiff's house to interview Jonathan. (Pelland Dep. 66-67). Plaintiff was made aware of this at the hearing. (Pretrial Tr. 8). Pelland testified that he was sent to talk to Jonathan to determine whether Plaintiff's claim that he was home-schooling Jonathan was true. (Pelland Dep. 68). Pelland was aware that Plaintiff was in court during his visit to Plaintiff's residence. (*Id*. at 71). He stated that Jonathan let him in voluntarily. (*Id*. at 73). Pelland testified that when asked about home-schooling, Jonathan became "nervous," and asked him to leave. (*Id*. at 76-77). As his reason for talking to Jonathan outside the presence of his father, Pelland stated:

> I thought it would be better to try to talk to Jon without his father's presence because of my previous conversation with Jonathan about the threat, the threatening note at the school, how controlling he was, how uncomfortable it made Jon[athan] feel. I thought that it would be an opportune time for me to talk to him and [illegible] to get some truth from him.

(*Id*. at 80:20-25, 81:1-2).

Pelland noted the following about his April 5, 2005 conversation with Jonathan:

> John was very nervous during the brief conversation. He answered the door with his

pants undone and s [illegible] disheveled. His hair appeared that he had just woken up and writer could hear a television in the background.

When asked if he ever leaves the house, John stated "not really." When asked if he played outside, John stated "no." When asked if he played with other kids, John stated "no." When asked if he played sports or was involved in other activities, John stated "no."

John indicated that he does not have any school books and that he doesn't know where any "learning materials" are. John would not state if he was attending school, being home schooled, or tutored. He became reluctant to answer questions and asked writer to leave.

(Def. Br. Ex. I, 5/6/05 Supp. Incident Report).

In an affidavit dated December 20, 2005, Jonathan stated that on "April 26, 2005," (it appears that the proper date should be "April 5"), Pelland did not wait for Jonathan's answer before walking in the residence. (Pl. Br. Ex. 17, Jonathan White Aff. ¶ 4). Jonathan stated that he asked Pelland several times to leave before Pelland ultimately left. (*Id.* ¶¶ 5-8).

On April 7, 2005, Plaintiff and Grosse Ile Schools entered into a "Settlement Agreement," resolving the administrative appeals of Jonathan's suspension. (Pl. Br. Ex. 6, Settlement Agreement). The Agreement provided:

1.    Student will be provided with the homebound education services of two hours per week for the balance of the 2004-05 school year school calendar.

2.    The father shall forthwith withdraw all pending complaints and appeals against the district, including specifically a pending MDCR Complaint (337222), a pending Special Education Committee Complaint appeal and a discipline appeal to the school board.

3.    The father shall voluntarily withdraw his request for an impartial due process hearing on January 14, 2005 IEPT.

4.    The father agrees that Jonathan will not be enrolled in the Grosse Ile Township Schools during the 2005-06 school year.

5.    The district agrees that is has not and will not pursue a truancy complaint for

the time the student has not been in school in the months of November 2004 through April 2005.

(*Id*.).

On April 19, 2005, Pelland contacted the Michigan Board of Education ("MBE") to inquire about home schooling. (Pelland Dep. 61; Bazzett Notes). Pelland testified that he called the MBE because he thought, mistakenly, that individuals who home-schooled their children needed to register with the state. (Pelland Dep. 61). During that call, Pelland discovered that Plaintiff had not called the MBE to inquire about home schooling until after Pelland had sent notice of the misdemeanor warrant in mid-March 2005. (*Id*.).

Plaintiff explained at his deposition why he did not just simply turn over relevant home schooling materials to the police or the prosecutor:

Q:   Why wouldn't you just show the prosecutor, look, this is what I'm doing, this is how I'm taking care of my child?

A:   I don't recall the prosecutor ever asking.

Q:   Did you receive a subpoena for materials being used regarding education for your child?

A:   Yeah, I think we did.

Q:   And do you remember making an on the court record in court where you said you would provide documents regarding the home schooling of your child?

A:   Yes.

Q:   So whether or not the prosecutor specifically asked you these things or not, you obviously were given the opportunity to provide these items to the police, the prosecutor, or the Court that would in your mind exonerate you from truancy, correct?

A:   Under those circumstances I didn't think that it was going to accomplish that, no.

Q:   And why did you think it was going to accomplish that?

A:   They were clearly attempting to manufacture a case. And that wasn't appropriate for that to be decided anyway.

. . . .

Q:   And if you weren't going to give them the school materials, why did you say in open court that you would?

A:   There were intervening circumstances between that time and the time that – the court date.

10

Q:      What were the circumstances?
A:      It became obvious to me that there was no investigation going on here. This was basically a witch hunt. And that they were not interested in investigating anything.

(White Dep. 61:24-25, 62:1-23, 65:4-13).

On April 26, 2005, at approximately noon, Judge Nykiel conducted the scheduled hearing, at which Camargo, Pelland, and Plaintiff appeared. (Def. Br. Ex. J, 4/26/05 Hearing Tr.). Plaintiff failed to bring either his son or the subpoenaed home schooling materials. (*Id*. at 3). Camargo moved to hold Plaintiff in contempt, but Judge Nykiel denied that request. (*Id*. at 12). Judge Nykiel inquired about the effect of the settlement agreement, and Camargo responded that the agreement did not prevent Pelland from being the complaining witness, or the state from prosecuting. (*Id*. at 17). Camargo moved to have the case dismissed without prejudice, and then indicated that she would reissue the case that afternoon when Jonathan could be present. (*Id*. at 24). Judge Nykiel granted the request, and dismissed the case without prejudice (*Id*. at 26).

Plaintiff testified that he was aware that APA Camargo indicated that she would be seeking a search warrant for home schooling materials. (White Dep. 85).

At the direction of Camargo, Pelland, with Officers Carmack and McLaughlin, executed the search warrant at Plaintiff's residence at 4:18 p.m. on April 26. (Pelland Dep. 88, 98; Def. Br. Ex. K, Camargo Aff. ¶ 4). Pelland testified that but for the prosecutor's instruction, he "probably" would not have sought a search warrant on his own. (Pelland Dep. 89).

Pelland's police report noted the following about the execution of the search warrant:

APA Camargo requested that writer submit a search warrant for approval and to obtain any evidence of home schooling found at the White residence. Writer subsequently submitted a search warrant affidavit which she approved. The search warrant was then signed and approved by 33rd District Court Judge Edward Nykiel

At approximately 4:18 p.m. writer responded . . . . to execute the search warrant. Patrolman Daniel McLaughlin and Douglas Carmack assisted.

Writer knocked on the door several times and rang the door several times to no avail. Writer opened the unlocked front door and called for someone within the residence. Christopher White, the son of Mr. White, was in the basement listening to music and came upstairs. Christopher was given a copy of the search warrant and asked to contact his father. Christopher identified his brother John's bedroom, which faces the front of the residence.

. . . .

Writer checked the contents of items #4 and #5 and found minimal notes, writings or work completed. In fact, the Top Flight notebooks (Item #5) each had two pages written on them. It is not known if this work was done at school or at home.

. . . .

Writer asked Mr. White to open the safe, to which he replied he would not. Writer informed him that the safe would be removed from the residence so it could be opened and the contents searched, to which Mr. White replied, "go ahead, take it." NOTE: The safe was located under a desk across from the computer desk.

. . . .

Furthermore, there was not any evidence found that John is being home schooled.

Writer explained to Mr. White that the search was intended to find proof of home schooling and that if he had any such proof it should be presented. When presented with this opportunity, Mr. White advised writer to "go fuck yourself."

. . .

The search concluded at about 5:55 p.m.

(5/6/05 Supp. Incident Report)

Plaintiff arrived home during the execution of the warrant. (White Dep. 88). The officers presented the search warrant to Plaintiff. (*Id.*). Pelland testified that the officers took the safe because Plaintiff refused to open it. (Pelland Dep. 141).

During the search, McLaughlin accidentally left a police garrison hat, and Pelland left a jacket with a set of keys at Plaintiff's residence. (Def. Br. Ex. L, McLaughlin Dep. 16-17; Pelland Dep. 114-15). McLaughlin and Carmack returned to Plaintiff's residence several times the evening after the search regarding the property. (McLaughlin Dep. 19; 5/6/05 Supp. Incident Report). Plaintiff admitted that he did not allow Carmack to retrieve the hat and personal items,

since he "was already half undressed and on [his] way to bed." (White Dep. 89).

Pelland returned to the residence at 9:30 a.m. the next morning and received no answer at Plaintiff's door. (5/6/05 Supp. Incident Report). Plaintiff then went to Grosse Ile High School to speak with Plaintiff's other son, Christopher White, about the police property. (*Id*.). Christopher told Mr. "Maci" that Plaintiff advised that Chris not speak to the police, other than to state the Plaintiff and his sons were looking for the property. (*Id*.). At 1:30 p.m., Pelland tried Plaintiff's residence again, with no answer. (*Id*.).

On April 27, 2005, after consulting with APA Ken Simon, Pelland applied for a search warrant of Plaintiff's residence to regain the officers' departmental and personal property. (Pelland Dep. 116, 125). Simon authorized the warrant for "larceny." (Def. Br. Ex. N, Simon Aff. ¶ 5). Judge Nykiel approved the search warrant request.

Pelland's report recounted the following:

On Wednesday, April 27, 2005, at approximately 6:51 p.m., writer went to the White residence . . . . to execute the search warrant. Writer was accompanied by Patrolmen Douglas Carmack and Todd Brozek.

Writer knocked at the front door and received no response. Writer knocked a second time and again received no response. NOTE: Mr. White's vehicle was in the driveway at this time. Officers had made frequent checks of the residence to await for his return in lieu of entering the property with force and with nobody home.

Writer checked the door and found it to be unlocked. Writer opened the door and announced "police department." Mr. White was observed in the kitchen talking on the phone. Mr. White asked what writer wanted, and he was advised of the missing property. Mr. White replied, "It's not here." Writer responded, "I need that property." Mr. White then inquired if writer had a search warrant, which was produced and given to Mr. White.
. . . .
Ptl. Carmack approached writer and stated that Mr. White informed him that the property was not in the home. Ptl. Carmack inquired if the search warrant included Mr. White's vehicle, which it did. This prompted Ptl. Carmack to search the vehicle, with negative results. Mr. White's comments led Ptl. Carmack and Brozek to

> concentrate on the exterior of the residence. Before reaching a shed in the back yard or the attached garage, Ptl. Brozek located all three missing items on a table in the back yard.

(5/6/05 Supp. Incident Report). Carmack testified that the officers found the missing items outside Plaintiff's residence "on a table, sawhorse thing." (Def. Br. Ex. M, Carmack Dep. 13).

On April 27, 2007, Pelland also visited Grosse Ile Middle school to inquire whether the notebooks found in the search warrant represented work Jonathan performed prior to his suspension. (5/6/05 Supp. Incident Report). Teachers at the school confirmed that the work in the notebooks had been completed before his suspension. (*Id*.).

On May 9, 2005, Pelland sent in a warrant request to the Wayne County Prosecutor's Office on the charge of "larceny by conversion," arising out of the April 27, 2005 search warrant. (Pl. Br. Ex. 12, 5/9/05 Warrant Request). On May 13, 2005, APA Simon denied the warrant request, stating that there was "insufficient proof that Def. intended to permanently deprive P.O.S. of the property (which is a necessary element of any larceny charge)." (*Id*.).

On May 26, 2005, Pelland submitted a second warrant request on the truancy charges to the Wayne County Prosecutor's Office. (5/6/05 Supp. Incident Report; Pl. Br. Ex. 13, 5/26/05 Warrant Request). Pelland did not immediately receive a response. On November 14, 2005, Pelland spoke with APA Roberta Bryant as to the status of the warrant request. (5/6/05 Supp. Incident Report). On November 16, 2005, Pelland received a fax that indicated that APA Kenneth Simon had denied the second warrant request. (*Id*.). On November 17, 2005, he sent a letter to Plaintiff to pick up his property. (*Id*.; Pelland Dep. 137).

On March 6, 2007, Plaintiff filed the instant federal case against Pelland, McLaughlin, Carmack, and Barron. Plaintiff alleged the following counts pursuant to 42 U.S.C. § 1983 and

state law:

Count I:      Malicious Prosecution
Count II:     Illegal Search & Seizure
Count III:    False Arrest
Count IV:     Supervisory Liability
Count V:      Gross Negligence

On March 7, 2007, Judge Nykiel held a hearing on motions filed by Plaintiff relating to quashing the search warrants issued on April 26 and 27, 2005, suppressing the evidence, and expunging his arrest record. (Def. Br. Ex. Q, 3/7/07 Hearing Tr.). Camargo and Plaintiff appeared. Camargo stated that she did not oppose these motions because Plaintiff had left the Wayne County jurisdiction, and Jonathan was then attending school in Oakland County. (*Id*. at 3-4).

Judge Nykiel granted Plaintiff's motions, and signed a proposed order provided by Plaintiff, to which Camargo did not object. (Pl. Br. Ex. 16, 3/7/06 Order).

On December 14, 2007, Defendants moved for summary judgment on all counts in the instant federal case.

## II.    ANALYSIS

### A.    Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of

evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B.     Qualified Immunity

The Sixth Circuit has provided the legal analysis under which to evaluate a defendant's claim of qualified immunity:

> The threshold question [a court] must address is whether, "in the light most favorable to the party asserting the injury, . . . . the facts alleged show the officer's conduct violated a constitutional right[.]" As a general matter, this requires that we "adopt[ ] . . . . the plaintiff's version of the facts. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."

> "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." "This inquiry . . . . must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." A third consideration occasionally examined by this court to "increase the clarity" of the analysis is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Floyd v. City of Detroit*, -- F.3d --, 2008 WL 596537, *4-5 (6th Cir. 2008) (internal citations omitted).

### C.     Probable Cause for Misdemeanor Warrant & False Arrest

Defendants contend that: (1) probable cause existed to obtain an arrest warrant for Plaintiff on the charge of truancy; and (2) since Plaintiff voluntarily appeared at his arraignment and subsequent booking at the Grosse Ile Police Department in connection with the misdemeanor truancy warrant, he was never deprived of his liberty for the purposes of a false arrest claim under § 1983.

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (internal citations omitted). However, if a plaintiff can show that a police officer provided "misleading or omitted information critical to finding of probable cause," a facially valid warrant is not a sufficient defense. *Id*. at 677 n. 4. Once probable cause has been established for an arrest, a policeman is under no obligation to continue investigating every basis for a suspect's claim of innocence. *Boykin v. Van Buren Tp.*, 479 F.3d 444, 449-50 (6th Cir. 2007); *Crockett v. Cumberland College,* 316 F.3d 571, 581 (6th Cir. 2003) ("Once the officer establishes probable cause, he or she is under no obligation to continue investigating and may instead pursue the arrest of a suspect").

Michigan law provides for compulsory public school education for children between the ages of six and sixteen, with certain exceptions:

(1)     Except as otherwise provided in this section, every parent, guardian, or other person in this state having control and charge of a child from the age of 6 to the child's sixteenth birthday shall send that child to a public school during the entire school year. The child's attendance shall be continuous and consecutive for the school year fixed by the school district in which the child is enrolled. In a school district that maintains school during the entire calendar year and in which the school year is divided into quarters, a child is not required to attend the public school more than 3 quarters in 1 calendar year, but a child shall not be absent for 2 or more consecutive quarters.
. . . .
(3)     A child is not required to attend a public school in any of the following cases:
. . . .
    (f)     The child is being educated at the child's home by his or her parent or legal guardian in an organized educational program in the subject areas of reading, spelling, mathematics, science, history, civics, literature, writing, and English grammar.

Mich. Comp. Laws § 380.1561.

Michigan law further states that a "parent or other person in parental relations who fails to comply with this part is guilty of a misdemeanor, punishable by a fine of not less that $5.00 nor more than $50.00, or imprisonment for not less than 2 nor more than 90 days, or both." Mich. Comp. Laws § 380.1599.

Plaintiff states that Pelland ignored or omitted the following exculpatory facts in his request for an arrest warrant, that: (1) homeschooling was an exception to compulsory school attendance under Michigan law; (2) Plaintiff's mother was prohibited from contacting Jonathan's school or to make decisions regarding his education; (3) Pelland made a conscious choice not to interview Plaintiff; and (4) Pelland mistakenly included in the warrant request that Plaintiff had prior criminal convictions.

In this case, since a state district judge approved the arrest warrant request, this Court only looks to whether Pelland included false or misleading information in his warrant request that was other critical to the state court judge's determination of probable cause.

From the record, Pelland was aware of, and included, the following facts in his arrest warrant application on February 18, 2005: (1) as of November 9, 2004, Jonathan had been suspended from his school for at least 180 days; (2) Jonathan had failed to enroll in Downriver Middle School, as arranged by officials from Grosse Ile Middle School; (3) as of February 8, 2005, no other school had requested Jonathan's school transcripts; (4) Assistant Principal Haywood had visited Plaintiff's residence twice and found Jonathan home alone during the middle of the day; and (5) Jonathan had told his mother that he was not attending school (and failed to mention anything about alleged homeschooling).

Plaintiff argues essentially that if Pelland had done a more "thorough" investigation, Pelland would have discovered that Jonathan was being homeschooled. However, as explained above, Pelland is under no obligation to investigate every claim of innocence before making a decision to seek an arrest warrant. Furthermore, there is no evidence in the record that Pelland was aware that Plaintiff was claiming that he was homeschooling Jonathan as of February 18, 2005. Finally, there is no indication that Pelland's mistaken statement that Plaintiff had a previous criminal record was a "critical" factor in the state court judge's determination of probable cause -- moreover, the attached LEIN printout sheet revealed that Plaintiff in fact did not have any prior criminal convictions.

Therefore, since there is no indication that Pelland either included misleading or omitted information that would have been critical to the state court judge's finding of probable cause to support the arrest warrant, the Court GRANTS summary judgment to Defendants on Plaintiff's false arrest claim.

### C.      Malicious Prosecution

Defendants contend that Plaintiff cannot maintain a malicious prosecution claim against Pelland since there is no evidence that he supplied false information to the prosecutor.

The Sixth Circuit has recognized that a malicious prosecution claim under § 1983 cannot be maintained against police officers unless there is evidence that the officers supplied false information to the prosecutor or to the court in order to establish probable cause. *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007).

As explained above, there is no indication that Pelland supplied any false or fabricated information to Camargo or to Judge Nykiel.[2] Therefore, the Court GRANTS summary judgment to Defendants on Plaintiff's malicious prosecution claim.

**D.  Illegal Entry / Search**

Plaintiff claims three separate illegal entry / search claims under § 1983: (1) Pelland's April 5, 2005 visit to interview Jonathan at Plaintiff's residence, when Plaintiff was at 33rd District Court; (2) the April 26, 2005 search warrant for school materials; and (3) the April 27, 2005 search warrant to recover the officers' departmental and personal property.

1.  April 5, 2005 Interview with Jonathan

Plaintiff contends that Pelland's visit to his residence to interview Jonathan constituted an illegal entry under § 1983, since: (1) Jonathan's mother did not have authority to permit Pelland to enter Plaintiff's residence; (2) Jonathan could not give consent to enter the home; and (3) Pelland refused to leave Plaintiff's residence when requested by Jonathan.

Defendants respond that: (1) Pelland did not perform a search of the house; (2) Jonathan had apparent authority to consent to Pelland's entry; and (3) Pelland was acting as a "community caretaker" – as he did not enter the home to uncover evidence, but to confirm that Jonathan was being homeschooled.

On the issue of consent exception to the warrant requirement, the Sixth Circuit has explained:

_____

[2]     To the extent that Plaintiff argues that his April 7, 2005 "Settlement Agreement" with the Grosse Ile School District precluded his prosecution, the Court finds those contentions to be unavailing. First, the record is clear that Pelland was unaware of this agreement. Even if he were, Michigan law does not require that the complainant in a criminal case involving truancy be the school district. Finally, the agreement did not purport to bind the Grosse Ile Police Department or Wayne County Prosecutor's Office from filing criminal charges.

> An exception to the Fourth Amendment's prohibition on warrantless searches applies where officers obtain voluntary consent to search, either from the person whose property is searched, or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," Common authority enables a third party to consent to a search if that third party has "joint access or control for most purposes." Even if third-party consent comes from a person without actual authority, the search is nonetheless valid if the police relied, in good faith, on the third party's apparent authority to consent to the search. An objective standard applies, and the search is valid if the officers reasonably could conclude from the facts available to them that the third party had authority to consent to the search.

*Johnson v. Weaver*, 248 F. App'x. 694, 697 (6th Cir. Sept. 24, 2007) (unpublished) (internal citations omitted). "Consent to a search 'may be in the form of words, gesture, or conduct.' In whatever form, consent has effect only if it is given freely and voluntarily. Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (internal citations omitted).

The Sixth Circuit has also recognized that in certain circumstances, children can consent to searches of their parents' residences. *See, e.g., United States v. Clutter*, 914 F.2d 775, 778 (6th Cir. 1990) (holding that a twelve and fourteen year-old children in the house "enjoyed that degree of access and control over the house that afforded them the right to permit inspection of any room in the house, and defendants assumed that risk"); *United States v. Cork*, 18 F. App'x. 376, 383 (6th Cir. Sept. 6, 2001) (unpublished) ("Therefore, under *Clutter,* family members are deemed to have 'common authority' over all areas in the home unless another family member has clearly manifested an intent to exclude others from an enclosed space").

Plaintiff does not controvert that Jonathan had "common authority" over Plaintiff's residence. However, the issue is whether Jonathan actually consented to Pelland's warrantless

entry of his home. Pelland testified that Jonathan let him in voluntarily, answered a few questions, and then asked him to leave. In his December 2005 affidavit, Jonathan stated that Pelland did not ask whether he could enter the house, pushed his way inside, and then refused to leave after several requests.

Defendants further argue that Pelland was performing a "community caretaker" function in ensuring Jonathan's well-being. "The lynchpin of any effort to rely upon a 'community caretaker' justification for a warrantless entry is that the governmental action in question must be 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Strutz v. Hall*, 308 F. Supp. 2d 767, 778 (E.D. Mich. 2004) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that: (1) Jonathan did not consent to Pelland's entry of the house; and (2) Pelland's motive in going to the residence was not "totally divorced" from obtaining evidence from Jonathan relevant to Plaintiff's criminal prosecution.

Therefore, the Court DENIES summary judgment to Pelland on Plaintiff's illegal entry claim.

### 2. April 26, 2005 Search Warrant

Plaintiff contends that the April 26, 2005 search was illegal for the following reasons: (1) there was no substantial basis or fair probability that evidence of illegal activity at Plaintiff's residence; (2) there is no "good faith" exception; and (3) the district court ruled there was no probable cause for the issuance of the search warrant.

On the elements of an illegal search claim, the Sixth Circuit has recognized:

Although officers are entitled to rely on a judicially-secured warrant for immunity in a Section 1983 action claiming illegal search, if the warrant is so lacking in indicia of probable cause that official belief in the existence of probable cause is unreasonable, qualified immunity is not appropriate. In *Malley,* the plaintiffs alleged that a police officer caused them to be arrested unconstitutionally by presenting to a judge a complaint and supporting affidavit that failed to establish probable cause. The Supreme Court rejected an argument that a police officer who had been sued for making an allegedly unconstitutional arrest should be conclusively deemed entitled to immunity as long as an independent magistrate had issued a warrant for the arrest. The Court subscribed to an "objective reasonableness" test: "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . . the shield of immunity [will] be lost."

Under an "objective reasonableness" test, the officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." The proper inquiry, therefore, is whether a reasonably competent investigator armed with [the officer's] knowledge and experience could have believed that probable cause existed to search [a particular place].

*Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004) (internal citations omitted).

At the April 26, 2005 hearing, Plaintiff failed to comply with his own representation to Judge Nykiel that Plaintiff would produce Jonathan and evidence of his homeschooling. Camargo moved for a dismissal without prejudice, and represented to the court that she would reissue the case after a new search warrant was executed. Upon Camargo's instruction, Pelland drafted an affidavit, which was approved by Camargo, and signed by Judge Nykiel.

Plaintiff contends that the search warrant was illegal because it authorized a search for "no evidence" – rather than a search for evidence of a crime. Plaintiff cites no legal authority for such a proposition. By April 26, 2005, there is no doubt from the record that Plaintiff was under suspicion for the crime of truancy and that Plaintiff insisted that he was homeschooling his

child.[3] Obviously, evidence for the relevant crime would be the lack of homeschooling materials for Jonathan. There is also no import to the fact that the original case had been dismissed without prejudice to the legality of the subsequent search warrant.

Furthermore, there is no indication that Pelland made any misrepresentations or material omissions in his application for a search warrant.

Finally, the fact that Judge Nykiel signed Plaintiff's proposed order in the state criminal proceeding stating that no probable cause existed for the April 26, 2005 search warrant does not preclude this Court from concluding otherwise in the instant civil case. "Collateral estoppel, also known as 'issue preclusion,' applies when three elements have been met: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full [and fair] opportunity to litigate the issue; and (3) there must be mutuality of estoppel." *Michigan Dep't. of Transportation v. North Central Co-op. LLC*, -- Mich. App. --, 2008 WL 204117 (Mich. Ct. App. 2008) (internal quotations and citation omitted). Collateral estoppel will apply only if the basis of the former judgment can be "clearly, definitely, and unequivocally ascertained." *Ditmore v. Michalik*, 244

---

[3]    Plaintiff maintains that the Michigan Supreme Court case *People v. Bennett*, 442 Mich. 316 (1993), recognizes that under Mich. Comp. Laws § 388.554 parents who are homeschooling their children are entitled to an administrative hearing before prosecution for failure to comply with compulsory education laws.  Plaintiff contends that Pelland's failure to comply with Michigan law negates Pelland's basis for probable cause for the April 26, 2005 search warrant.

       The Sixth Circuit has held that "[u]nless a deprivation of some federal constitutional or statutory right has occurred, § 1983 provides no redress even if the plaintiff's common law rights have been violated and even if the remedies available under state law are inadequate." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). Hence, the fact that Michigan statutory law provides for an administrative hearing before the authorities can commence a truancy prosecution is a state-law right that does not implicate Plaintiff's federal constitutional rights.

Mich. App. 569, 578 (2001); *see Barrow v. Pritchard*, 235 Mich. App. 478, 481 (1999) (holding that crossover estoppel involving criminal and civil proceedings is permissible).

There are at least two reasons why under the instant circumstances Plaintiff cannot offensively collaterally estop Defendants from litigating probable cause in this case.

First, the issue of lack of probable cause for the search warrants was not actually litigated to invoke a collateral estoppel bar. Judge Nykiel found that the April 26 search warrant was supported by probable cause when he authorized it. Second, there was no substantive argument before Judge Nykiel on the issue of the existence of probable cause. The March 7, 2006 hearing transcript does not reveal that Camargo agreed that there was no probable cause to support the warrants. (3/7/06 Tr. 3-4; Camargo Aff. ¶ 8). In fact, Camargo indicated on the record that the reason for the dismissal of the case was that the Wayne County Prosecutor's Office lacked jurisdiction over Plaintiff since he had moved, and that Jonathan was then attending school. Thus, there is no clear, definite, and unequivocal basis for the determination.

Second, even if the issue of probable cause for the search warrants was fully and fairly litigated, Michigan courts have recognized that an offensive use of collateral estoppel requires mutuality. *Martin v. Metropolitan Life Ins. Co.*, 140 Mich. App. 441, 453-54 (1985); *see Monat v. State Farm Ins. Co.*, 469 Mich. 679, 691 (2004) (holding that mutuality is not required when collateral estoppel is being asserted defensively). The Sixth Circuit has recognized that suits under § 1983, a criminal-defendant-turned-civil plaintiff cannot offensively use collateral estoppel, because the police officers are not in privity for mutuality purposes with the prosecution in the criminal case. *See Burda Brothers, Inc. v. Walsh*, 22 F. App'x. 423, 430 (6th Cir. Oct. 12, 2001) (unpublished) ("Since the defendants, sued here in their individual capacities,

did not have a personal stake in the outcome of the earlier proceeding, plaintiffs may not use collateral estoppel offensively to preclude the relitigation of the validity of the search warrant"); *Glass v. Abbo*, 284 F. Supp. 2d 700, 705 (E.D. Mich. 2003) (same).

In the instant case, Plaintiff impermissibly requests that the Court apply collateral estoppel offensively against Pelland on the issue of probable cause for the search warrants.

Therefore, the Court GRANTS summary judgment to Pelland on Plaintiff's illegal search claim.

### 3. April 27, 2005 Search Warrant

Plaintiff briefly argues that Pelland, Carmack, and Brozek conducted an illegal search on April 27, 2005, in their efforts to retrieve department and personal property.

The Court disagrees. The record clearly reveals that Defendants attempted on several occasions to retrieve their property with the voluntary cooperation of Plaintiff – and he refused. When it became apparent to Defendants that Plaintiff would not return the property, a search warrant was sought for the crime of larceny by conversion. *See* Mich. Comp. Laws § 750.356.

Furthermore, the APA authorized, and Judge Nykiel, approved the search warrant request, and there is no indication that Defendants made any material misrepresentations or omissions on the search warrant affidavit.

Therefore, the Court GRANTS summary judgment to Defendants Pelland and Carmack on Plaintiff's illegal search claim.

### E. Supervisory Liability

Plaintiff contends that Chief of Police Barron is liable under § 1983 for supervisory liability based on the following: (1) Barron instructed Pelland to "follow the book" during the

investigation; and (2) Barron kept in contact with Deputy Chief Skrocki for updates on Pelland's progress.

"Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. Rather, the supervisors must have actively engaged in unconstitutional behavior. Therefore, liability must lie upon more than a mere right to control employees and cannot rely on simple negligence." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (internal citation omitted). "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *McQueen v. Beecher Community Schools*, 433 F.3d 460, 470 (6th Cir. 2006) (internal citations and quotations omitted). Furthermore, there can be no supervisory liability without an underlying unconstitutional act. *Holz v. City of Sterling Heights*, 465 F. Supp. 2d 758, 773 (E.D. Mich. 2006) ("Supervisory liability, therefore, is premised on the underlying unconstitutional actions of an officer over whom he exercises authority").

There is no evidence in the record that Barron had any role in Pelland's visit to Plaintiff's residence on April 5, 2005 – much less that he "actively engaged in unconstitutional behavior."

Therefore, the Court GRANTS summary judgment to Barron on Plaintiff's supervisory liability claim.

F.      **State Law Claims of False Arrest and Malicious Prosecution**

Plaintiff asserts related state law tort claims of false arrest and malicious prosecution. False arrest requires the plaintiff to show that the defendant participated in an illegal and unjustified arrest and that the defendant lacked probable cause to do so. *Walsh v. Taylor,* 263 Mich. App. 618, 626 (2004). The elements of malicious prosecution are: "(1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Matthews v. Blue Cross & Blue Shield of Michigan,* 456 Mich. 365, 378 (1998).

As explained above, the Court finds that Pelland's actions in connection with the truancy arrest warrant request in March 2005 was supported by probable cause and with no indication that Pelland made any materially false statements or omissions in his truancy arrest warrant affidavits.

Therefore, the Court GRANTS summary judgment to Pelland on Plaintiff's state law claims of false arrest and malicious prosecution.

### G.     State Law Claim of Gross Negligence

Plaintiff contends that "Pelland was grossly negligent when he pursued and continued the prosecution of [Plaintiff], by and through oral and written misstatements of fact, intentional omissions of important facts and as otherwise set forth in the arguments under the issues set forth above." (Pl. Br. 29).

> Under the governmental immunity act, a governmental employee is not liable in tort for personal injuries as long as the employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." "Gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for

28

whether an injury results." "Police officers . . . . must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers."

*Oliver v. Smith*, 269 Mich. App. 560, 565 (2006) (internal citations omitted).

As explained, *supra*, there is no convincing evidence that Pelland made either written or oral misrepresentations, much less that his conduct during his investigation was "so reckless as to demonstrate a substantial lack of concern whether an injury results."

Therefore, the Court GRANTS summary judgment to Pelland on Plaintiff's gross negligence claim.

## III.    CONCLUSION

For the foregoing reasons, the Court hereby:

  (1)    **GRANTS** summary judgment to Pelland on Plaintiff's federal and state false arrest,  malicious prosecution, and gross negligence claims;

  (2)    **GRANTS** summary judgment to Pelland on Plaintiff's illegal search claims;

  (3)    **GRANTS** summary judgment to Barron on Plaintiff's supervisory liability claim; and

  (4)    **DENIES** summary judgment to Pelland on Plaintiff's illegal entry claim occurring on April 5, 2005.

Therefore, only the illegal entry claim will proceed to trial against Pelland.

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 14, 2008

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 14, 2008.

s/Denise Goodine
Case Manager